WANDA KOZLOWSKA ET AL. *v.* JAN NAPIERKOWSKI.

[No. 67, October Term, 1933.]

*Decided, January 12th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*J. Calvin Carney,* with whom was *Emil T. Mallek* on the brief, for the appellants.

*Adam S. Gregorius* and *Malcolm J. Coan,* with whom was *Paul B. Mules* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee, Jan Napierkowski, on May 29th, 1931, had on deposit in his name, with the St. Casimir Building & Loan Association of Baltimore City, the sum of $5,000. At that time, though married, he was not living with his wife, against whom he had instituted proceedings for an absolute divorce. She answered the bill and filed a cross-bill asking for a like divorce from him. The case was heard, and the bill of each was, on March 31st, 1930, dismissed. On the 18th of April, 1930, the appellee went to live at No. 516 South Duncan Street, the home of Bronislawa Kowalska, who in the bill filed herein is said to have been a widow. Thereafter, on May 29th, 1931, the appellee, with Bronislawa Kowalska, went to the St. Casimir Building & Loan Association and withdrew the said $5,000 from his account, and upon his direction the money was deposited in said association in the name of Bronislawa Kowalska, and she was given a bank book showing the deposit of $5,000 in her name. On June 26th, 1931, $500 was drawn from this account by Bronislawa Kowalska and paid upon a mortgage then resting upon the property at 516 South Duncan Street, owned by her. On August 22nd, 1931, $300 was withdrawn by her upon this account. It is not definitely shown what disposition was made of this money; but the record discloses that money was drawn from time to time to purchase furniture for the house in which she and the appellee lived, and this money may have been used for that purpose. Later, on September 1st, Mrs. Kowalska drew upon this account for $2,025.50 to make a payment upon property at No. 617 South Ellwood Avenue, bought at that time, the title to which was placed in her name. When the Ellwood Avenue property was bought, a loan was granted to Mrs. Kowalska

for the sum of $1,500, secured by a mortgage on that property; and on November 3rd, 1931, the mortgage was fully paid off with a check for $1,450 drawn on said account.

On July 20th, 1932, Bronislawa Kowalska died, leaving as her only heir her daughter, Wanda Kozlowska. Emil T. Mallek was appointed administrator of the estate of Bronislawa Kowalska, at whose death only $615 remained on deposit in the building and loan association in the account in her name. On August 1st, 1932, the appellee, Jan Napierkowski, filed his bill alleging therein that Wanda Kozlowska, the heir, and Emil T. Mallek, the administrator, were about to make a demand and collect from the building and loan association the balance of the account, $615, standing in the name of Bronislawa Kowalska, and had threatened to evict him from the fee simple property at 617 South Ellwood Avenue, which he had occupied as his home since its purchase; and in the prayer of his bill he asked that the $5,000 deposited by him in the name of Bronislawa Kowalska in the building association "be decreed to have been held by her in trust for her own and his use, with the unused balance payable to the survivor, and the said fee simple property 617 S. Ellwood Avenue be fully imposed with the said trust, and the leasehold property 516 S. Duncan Street to the extent of $500 of the said trust fund invested therein." The bill alleged, in addition to the facts stated, that on May 19th, 1924, the appellee's wife "deserted and deprived him of his home, and ever since that date he boarded in other homes until April 18th, 1930, when he went to live in the home of the late Bronislawa Kowalska, who was then a widow"; that the appellee "and the said Bronislawa Kowalska intended to marry so soon as he obtained a divorce from his said wife, and meantime he withdrew all his savings, amounting to $5,000.00, from Saint Casimir's Building and Loan Association, Incorporated, on the 29th day of May, 1931, and on the following day he deposited the said sum with the said building association in the name of the said Bronislawa Kowalska upon the understanding and agreement among them that the said sum of money was to be held by the

said Bronislawa Kowalska in trust for her own and his use until after their marriage and by the entirety thereafter."

Wanda Kozlowska and Joseph Kozlowska, her husband, and Emil T. Mallek, administrator, the defendants below and appellants in this court, answered the bill. In their answer they admitted the deposit of $5,000 of May 30th, 1931, in the building and loan association in the name of Bronislawa Kowalska, but did not deny that it was a transfer to her of the appellee's account in said association made upon his direction. The answer likewise admits the withdrawals and the disposition of the amounts as stated in the bill. With the answer, a demurrer was filed, but it does not appear from the record that any action was ever taken upon it. Upon petition subsequently filed, the building association was made a party defendant in the proceedings.

Evidence was heard by the court upon the bill and answer, and at the conclusion of the evidence a decree was passed in which it was ordered and decreed: (1) That the building and loan association pay unto the appellee or his attorneys therein named the sum of $615 on deposit in said association; (2) the appointment of the appellee's attorney, Adam S. Gregorius, as trustee to convey unto the appellee the property No. 617 South Ellwood Avenue, "and to transfer and assign unto the said Jan Napierkowski to the extent of a $500.00 cash interest therein" the leasehold property No. 516 South Duncan Street, "the remaining interest in the said leasehold property to be and remain vested in Emil T. Mallek, Administrator"; (3) that the administrator be "enjoined from replevying or in any other manner interfering with the possession" by the appellee of the household furniture and contents of his present home at 617 South Ellwood Avenue; and (4) that the defendants pay the costs of the proceedings.

It is the contention of the appellants that the evidence in the case establishes a completed gift from Jan Napierkowski to Bronislawa Kowalska of the $5,000 deposited in her name upon his direction in the building and loan asso-

ciation; or, if it should be found that a trust was thereby created, as alleged in the bill, such trust was contrary to public policy and one that a court of equity will not lend its aid to enforce, but will deny all affirmative relief to any of the parties, and will leave them in the same situation in which they have placed themselves. The appellee, on the other hand, contends that it is not only a trust, but it is a trust that a court of equity would enforce. It is not denied in the answer that the $5,000 involved in this case was the property of Jan Napierkowski until it was transferred by his direction to Bronislawa Kowalska, nor would a denial of such fact, if made, be supported by the evidence in the case.

Adam M. Jaworski, the secretary of the St. Casimir Building & Loan Association, testified that on May 29th, 1931, there was a balance of $5,000 to the credit of the appellee in that association. On that day both the appellee and Mrs. Kowalska came to the office of the association, and the appellee said he wished to have his account changed from his name to hers; whereupon he made out a check to Jan Napierkowski for that amount, and the latter then and there indorsed it, and it was delivered to Mrs. Kowalska, who, on the following day, left the check with the witness, and the account was opened in her name. The witness testified further as follows: "He asked me to transfer the name in her name, and at first I made a remark, 'Are you married?' And of course I did not get no answer, and the answer that she gave me was that the former husband she was married to she did not harm him, and she would see that he would not lose and no harm would befall him. Those are the words she used at the time the money was transferred." To the question, "Did you ask him whether he wanted his name on the book?" the witness answered, "In a way I did." "Q. What did he tell you? A. He told me he would rather have it in one name for the present, and the money was deposited in her name only. Q. Did he tell you why he wanted it put in her name. A. No." When the court suggested that "there was a printed form for joint ownership but it was not filled

out?" the witness said, "No, the man (Jan Napierkowski) did not want that done at that time." Upon cross-examination, the secretary of the association was asked: "It was your understanding she could do anything she pleased for this money? A. That is what I was told. That was why it was transferred in her name. It was so she could do what she pleased with the money."

There was nothing said or done at that time indicating an agreement between the parties by which a trust of the character mentioned in the bill was intended to be created. The entry on the books of the association was in the nature of an absolute gift. If a trust was created, it must be found that its creation was established by other facts showing the existence of an agreement by which it was the intention of the parties to create a trust.

"Whether or not a trust has been created in any given case is, in the last analysis, a question of intention. No particular words are necessary to create a trust, and trust relations will be implied when it appears that such was the intention. The subject of the deposit being personalty, the trust may be created and proved by parol." *Stone, Admr., v. Nat. City Bank,* 126 Md. 231, 238, 94 A. 657, 659; *Foschia v. Foschia,* 158 Md. 69, 148 A. 121; *Coyne v. Supreme Conclave,* 106 Md. 54, 66 A. 704; *Snader v. Slingluff,* 95 Md. 356, 52 A. 510; *Smith v. Darby,* 39 Md. 268; *Clark v. Callahan,* 105 Md. 600, 66 A. 618; 39 *Cyc.* 51. As the existence of a trust depends upon the intention of the parties, we must consider the evidence in the case in order to ascertain their intention and to determine whether the alleged trust existed.

Stella Resch testified that she had known the appellee for about five years, and Bronislawa Kowalska from childhood. The latter visited her about every week, and told her that when the appellee "had come there to board with her he was taken sick. He was sick for a couple of weeks, very sick, and he was afraid he was going to die, because the doctor had told him he was a very sick man, and he told her, well, she was very good to him, taking care of him, that he would

take that money (the five thousand dollars in the, building and loan association) and put it in her name, because, he did not have anybody to leave it to, and if anything should happen to him, why the woman would not have anything and she would not be left out in the cold, and he had signed the money over in her name, and she had told me this right after he had done that, and she said, "Well, if anything should happen to me first no one—that is his money—I am just keeping it for him in case anything should happen to him right now'." The witness further testified that the Ellwood Avenue property "is Mr. Napierkowski's house because his money had paid for it * * * and she (Mrs. Kowalska) said she did have some money in the bank, but that belonged to Mr. Napierkowski." Stella Resch also said that she was told by Mrs. Kowalska that Napierkowski "gave her $500 to pay the mortgage off on the house at Duncan Street."

On cross-examination, the witness stated that the conversation in which she was told the facts above stated occurred the latter part of April, 1932. Mrs. Kowalska died the following July. When asked to tell again what was said by Mrs. Kowalska about the $5,000, turned over to her, the witness answered: "Well, she had told me that he had turned the money over to her while he was so sick. She did expect the man to die, and he was very good to her, and he felt sorry for the woman, the woman did not have anything when he had come there to board, because she had just mortgaged her home, and he had paid off the mortgage for her, and he did give her money off and on, and helped her daughter out." The witness said that the appellee was sick within a week or two of the time when he went to board with Mrs. Kowalska, and remained sick about a month before recovering sufficiently to go to work; he has been working ever since. The witness further stated that Mrs. Kowalska told her that "she would like to get married if he (Jan Napierkowski) would have got a divorce"; that Mr. Napierkowski also told her "if he got a divorce they could marry". The defendant's

counsel asked the witness: "Didn't Mr. Napierkowski tell you and Mrs. Kowalska tell you that Mr. Napierkowski had given Mrs. Kowalska this money? A. He did not give it to her. He told her that she could take care of the money while he was living, and if he was dead then it was hers. But that was his money and whatever he wanted or bought, why they went to the building and loan and drawed the money out."

Sophie Zepka testified that she was a boarder at Mrs. Kowalska's, taking her evening meals there, during the time Napierkowski boarded there; that she talked to Mrs. Kowalska about two or three times a week about the money here in question; sometimes she would volunteer to tell her and other times she would ask her about it; the last time they talked about it was in June before her death; she said she was told by Mrs. Kowalska that "Napierkowski had given her $500 to pay off a mortgage, then later he gave her $5,000." "She told me that he gave her the money because he was very ill. I asked her why she had that house in her name and what would become of the house after her death. Well, she said that no one could touch it because it was bought with his money. * * * The day after the money was given to her she came to me and told me that he had entrusted the money to her"; that the money with which the house on Ellwood Avenue was bought was paid for with Napierkowski's money and the furniture in the house was his.

Joseph Aspert, the secretary of a group of the Polish National Alliance, testified that he saw Mrs. Kowalska three weeks prior to her death; that she had ordered two tickets to a picnic for Napierkowski and herself; when he brought her the tickets, she told him that the house on Ellwood Avenue "was purchased on her name, that is John's (Jan) so long as we live. In case John (Jan) would die first, it would become her property, but in case she would die the property would remain for John (Jan)."

Evidence was offered by the defendants but it furnishes

us little or no assistance in determining the questions here to be decided.

To establish a trust such as the one here attempted, the evidence relating thereto must be clear and unmistakable both of the intent and the execution of that intent. *Taylor v. Henry,* 48 Md. 560; *Pearre v. Grossnickle,* 139 Md. 274, 279, 115 A. 49; *Austin v. Central Savings Bank,* 126 Md. 144, 94 A. 520; *Gordon v. Small,* 53 Md. 550; *Snader v. Slingluff, supra; Casualty Insurance Co.'s Case,* 82 Md. 560, 34 A. 778; *Coyne v. Supreme Conclave, supra; Ruhe v. Ruhe,* 113 Md. 600, 77 A. 797; *Mathias v. Fowler,* 124 Md. 658, 93 A. 298; *Geoghegan v. Smith,* 133 Md. 535, 105 A. 864; *Sieling v. Sieling,* 151 Md. 536, 135 A. 376, 381. In the case last cited, Judge Digges, speaking for this court, said: "Generally speaking, in order to create a valid trust three circumstances must concur: First, a definite subject-matter within the disposition of the settlor; second, a lawful, definite object to which the subject-matter is to be devoted; third, clear and unequivocal words or acts devoting the subject-matter to the object of the trust. 28 *Am. & Eng. Encyc. of Law,* 865, 866." And later in the opinion, quoting 26 *R. C. L.* 1203, the judge said: "The burden of proving the existence of a trust rests on the person asserting it, and he must prove it by clear and satisfactory evidence, having in view all the surrounding facts and circumstances and the intention of the parties."

There can, we think, be no question as to the insufficiency of the evidence to establish the trust alleged in the bill, which was that the "money was to be held by the said Bronislawa Kowalska in trust for her own and his use until after their marriage and by the entirety thereafter." It is the donor's act which originates the trust, and it is the intention with which he does the act that is material. *Milholland v. Whalen,* 89 Md. 216, 43 A. 43. Practically the only evidence as to the intention of the parties to create a trust is that found in the testimony of witnesses, telling what was said to them by Mrs. Kowalska, the beneficiary of the alleged trust. This evidence, unintelligently expressed, in part gives the con-

clusions or opinions of Mrs. Kowalska as to the effect of the deposit made in her name, which are not based upon any agreement had between her and Napierkowski as to the deposit. In addition to this, the testimony is confusing because of the injection therein of the conclusions of the witnesses themselves as to the effect of such deposit. Little allusion is made to an agreement of the parties as to the character of the disposition of the money deposited.

Little was said about the marriage. One of the witnesses stated that, when she asked Mrs. Kowalska why she had not put the deposit in two names, her reply was: "Why should I, when he gets the divorce we will be married and it will be in both our names." The witness also said, when asked if anything had been said to her about Napierkowski marrying Mrs. Kowalska: "Yes, she (Mrs. Kowalska) always told me she would like to get married if he would have got a divorce."

There may have been a disposition on the part of both that a marriage should be effected between them, but, at the time of the deposit of the fund in Mrs. Kowalska's name, Napierkowski had been denied a divorce; and the evidence does not support the claim that, at the time of the deposit, they agreed that she should hold it for his and her use until the date of their marriage, after which the money and property absolutely in her name should be disposed of in such way as to render them tenants by the entirety. It is true that one or two witnesses testified that they were told by Mrs. Kowalska that the fund on deposit, as well as the property which was paid for out of said fund, was to be his as long as he lived, and upon his death it was to go to her. This did not create the trust alleged in the bill, nor is the evidence found in the record sufficiently clear and unequivocal to create a trust of any kind. If a trust was created, it was created at the time of the transfer of the account, and in that transaction there is nothing to show the creation of such trust. The entry upon the association's books shows the deposit to be in the form and nature of an absolute gift.

At that time Napierkowski was asked if he wanted the deposit in both names, or if he wanted the money deposited

in a manner so as to create a trust, and he said "No." It was suggested to him how a trust could be created; he had the opportunity to create one, and he declined to do so, saying that he wished the account opened in Mrs. Kowalska's name alone, plainly showing that it was not his inteniton to create a trust as alleged. It was the intention of the parties at that time, when it is said the trust was created, which controlled.

In the face of these facts, the evidence produced in support of the existence of the alleged trust, if admissible at all, was certainly not sufficient to show, in contradiction of the written entry of deposit in the form of an absolute gift, that a trust at the time was created. The decree appealed from will be reversed.

*Decree reversed, with costs.*